CAROLE C. WILSON, Respondent-Appellant, v BRISTOL-MYERS COMPANY et al., Appellants-Respondents.

First Department, June 5, 1986

### APPEARANCES OF COUNSEL

*Kenneth A. Plevan* of counsel *(Peter S. Julian* with him on the brief; *Skadden, Arps, Slate, Meagher & Flom,* attorneys), for appellants-respondents.

*Robert E. Isner* of counsel *(William R. Hansen* with him on the brief; *Nims, Howes, Collison & Isner,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

Ross, J.

Defendants Bristol-Myers Company (Bristol-Myers) and Clairol Incorporated (Clairol), appeal from so much of Special Term's order as denied their summary judgment motion to dismiss the first, third and fifth causes of action of the complaint, which allege unjust enrichment, negligence in the failure to prosecute a patent application, and breach of implied contract, and breach of fiduciary duty, respectively. The plaintiff, Carole C. Wilson, cross-appeals from so much of the Special Term order as granted the motion of defendants Bristol-Myers and Clairol for summary judgment to the extent

of dismissing the second cause of action of the complaint, which alleges fraud.

Defendant Clairol, a subsidiary of codefendant Bristol-Myers, "is a well-known marketer of hair care and cosmetic products and personal care appliances". In this action, the plaintiff alleges that she and her husband, Robert P. Wilson (Mr. Wilson), while he was an employee of defendant Clairol, invented the so-called Clairol Mirror, and that the defendants allegedly wrongfully appropriated this alleged invention to their own use, without compensating plaintiff.

Since the very founding of our country, the laws of the United States have provided for the encouragement of inventors and the promotion of technological advances, through the use of patents for new and useful inventions.

The cornerstone for these laws is found in US Constitution, article I, § 8, clause 8, which reads, in pertinent part: "The Congress shall have Power * * * To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries".

Pursuant to this constitutional authority, the first United States Patent Act became law in 1790 (see, 1 Deller, Walker on Patents, preface at V [2d ed 1964]). In 1984, a series of amendments were made to the Patent Act of the United States (see, for the legislative history and purpose of these amendments, 1984 US Code Cong & Admin News, at 5827). However, Patent Act § 101 (35 USC § 101), which is entitled: "Inventions patentable", was not changed by the 1984 amendments, and it presently reads as it did in 1967, when plaintiff claims to have made her invention together with Mr. Wilson. Said section states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title".

The United States Circuit Court of Appeals for the Second Circuit stated in *Vanity Fair Mills v Olga Co.* (510 F2d 336, 338 [1975]), that: "To be patentable [under the laws of the United States] a product must be (1) useful, (2) novel, and (3) non-obvious. See, 35 U.S.C. §§ 101-103."

More than 100 years ago, the Court of Appeals of this State held in *Gillett v Bate* (86 NY 87, 92 [1881]), that: "The acts of Congress, authorize patents to be issued for new and useful

inventions, and utility, and novelty are conditions precedent to the validity of a patent, and in actions for infringement, the want of these requisites is a good defense". Subsequently, in *Downey v General Foods Corp.* (31 NY2d 56, 61 [1972]), a unanimous Court of Appeals decided: "The critical issue * * * turns on whether the idea suggested by the plaintiff was original or novel. An idea may be a property right. But, when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements" *(accord, Ferber v Sterndent Corp.,* 51 NY2d 582 [1980]). This court has held in *Bram v Dannon Milk Prods.* (33 AD2d 1010 [1st Dept 1970]): "Lack of novelty in an idea is fatal to any cause of action for its unlawful use".

Specifically, in her complaint, plaintiff contends that on April 16, 1967, while she and Mr. Wilson were considering the location of a cosmetic makeup mirror table in their home, they conceived the idea for a makeup mirror for home use. In an affidavit, plaintiff states that the purpose of the subject mirror would be to show a woman, allegedly, in a diversity of actual lighting conditions, through the use of a nonheat generating light source, that would avoid the perspiration problem. In other words, the concept or idea of plaintiff and Mr. Wilson consists of three parts: (1) a makeup mirror providing various types of light to duplicate the kind of lighting conditions under which the user will later be seen; (2) a "cold", i.e., fluorescent, light source; and, (3) filters to change the color characteristics of the emitted light.

Furthermore, according to plaintiff's affidavit, before plaintiff and Mr. Wilson came up with this mirror idea, all of the "then existing and available illuminated makeup mirrors [suffered from the basic fault of showing] a woman in generally flattering light, whereas [the woman] should really be looking at herself in 'true light'; that is a woman should apply makeup under light conditions that replicate the light conditions under which she later will be seen".

Based upon a review of the affidavit and examination before trial of the plaintiff, it appears that the plaintiff's claimed familiarity, concerning the way in which an illuminated makeup mirror should display the user, resulted from, *inter alia,* her experience with stage lighting techniques when she participated in the activities of the drama department, while she was attending college; her employment as a photogra-

pher's model and in photographic layout work for photographers; and, her employment in a public relations capacity by defendant Clairol for several months in 1962.

Mr. Wilson alleges in an affidavit, that: "Within a few days of the * * * conception of the variable light makeup mirror, I met with my wife at the studio of Art Schiffer, a professional photographer, where my wife and Art Schiffer demonstrated the operational feasibility of the concept utilizing various types of light sources and combinations of commercially available gel type and Kodak filters".

The employment of Mr. Wilson commenced with defendant Clairol in the capacity of product manager in 1960, and, by the spring of 1967, when he and the plaintiff conceived the mirror idea, he had been advanced to the position of special products manager.

Promptly, after the plaintiff and Mr. Wilson developed their variable light makeup mirror (VLMM) concept, Mr. Wilson, in view of his employment obligations to defendant Clairol, alleges, in an affidavit, that he disclosed in confidence the VLMM idea to some of his colleagues and superiors at defendant Clairol; and that he pointed out to these persons the prominent role that the plaintiff played in creating the concept.

Furthermore, Mr. Wilson contends, both in an affidavit and an examination before trial, that the employees of defendant Clairol with whom he discussed the VLMM responded very favorably to the concept. Finally, in the summer of 1967, Mr. Wilson had a conference with William Moss (Mr. Moss), who was, at that time, vice-president of defendant Bristol-Myers and head of the legal department and patent counsel. In substance, Mr. Wilson stated, in an affidavit, that, in pertinent part: "Mr. Moss [during their conversation] stated to the effect that 'wives don't invent things' and that, in his view, I [Mr. Wilson] was the inventor of the variable light makeup mirror [VLMM] since I was the first one who said it would be possible to put the various kines [sic] of lights we were discussing around the mirror".

Moreover, Mr. Wilson claimed, in the affidavit, mentioned *supra,* that Mr. Moss also told him that recognition of the plaintiff as co-inventor of the VLMM would only complicate matters for defendant Clairol; and, therefore, Mr. Moss allegedly advised Mr. Wilson that all references reflecting plaintiff's role should be deleted from memoranda prepared by Mr. Wilson.

Soon after Mr. Wilson's conversation with Mr. Moss, he (Mr. Wilson) told his wife about it. In an affidavit, plaintiff sets forth, in pertinent part, her response to receiving this information, as follows:

"At this same time my husband also told me that Bill Moss had also said, at some time during the discussion, that 'wives don't invent things'. While I did not think that such comment was very attractive, I treated it as an aside having nothing to do with his capacity as a lawyer.

"I accepted Bill Moss' determination, as patent counsel for CLAIROL, that the * * * [VLMM] was my husband's invention. I remained of such view and was unaware of any personal or individual interest as a coinventor [sic] of the [VLMM] concept until about July of 1971".

During an examination before trial, Mr. Wilson admitted that, when he revealed to personnel employed by defendant Clairol in 1967 the VLMM concept conceived by himself and plaintiff, the subject of their compensation by defendant Clairol concerning the development of that concept was never discussed. In pertinent part, at that deposition, Mr. Wilson testified, as follows:

"QUESTION:
[By Attorney for defendants Clairol and Bristol-Myers]

Did you tell any of these people that you expected to be compensated for disclosing that concept?

"ANSWER:
[Mr. Wilson]

No.

"QUESTION:

Or that your wife [the plaintiff] expected to be compensated for disclosing that concept?

"ANSWER:

No.

"QUESTION:

Did any of these people tell you or give you any reason to believe that either you or your wife would be compensated for disclosing that concept to Clairol?

"ANSWER:

No.

"QUESTION:

Or would be compensated if Clairol used that concept?

"ANSWER:

No.

"QUESTION:                    Did you say or do anything which you believe would have indicated to any of these people that either your or your wife expected to be compensated for disclosing that concept to Clairol or to be compensated if Clairol used that concept?

"ANSWER:                     No, I am sure I did not."

The defendant Clairol, in October 1967, filed its first patent application concerning the VLMM with the United States Patent Office (Patent Office). In this application, Mr. Wilson was named as the inventor of the VLMM. Prior to defendant Clairol submitting this application to the Patent Office, Mr. Wilson executed an assignment of all of his rights concerning the VLMM to defendant Clairol, who, as indicated *supra,* was Mr. Wilson's employer.

During the period that the first patent application was pending, defendant Clairol conducted a patent search, which uncovered "prior art", that appeared to have anticipated a variable light makeup mirror, and this "prior art" used different types of bulbs to vary the lighting. This so-called "prior art" consisted of three Japanese patents, and, in substance, they can be described as follows: (1) "Utility Model Publication No. 245/61 (Iwashima) published January 11, 1961, entitled 'Mirror With No Shadows and Varying Colors' "; (2) "Utility Model Publication No. 3631;67 (Chada et al.) published March 2, 1967, entitled 'Mirror Capable of Reflecting Light of Any Color Desired' "; and, (3) "Utility Model Publication No. 3633 67 (Takemaka et al.) published March 2, 1967, entitled 'Compact With Lamps' ".

Recently, a United States Circuit Court of Appeals, in *Kwik-Site Corp. v Clear View Mfg. Co.* (758 F2d 167, 173 [6th Cir 1985]), had occasion to explain the meaning of the words "prior art", as follows:

"Although a patented invention may meet the requirement of novelty under 35 U.S.C. § 102, 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains,' then the claimed invention is obvious and therefore

invalid. 35 U.S.C. § 103. The issue of obviousness-nonobviousness is ultimately determined as a conclusion of law reviewable by an appellate court * * * but this legal conclusion is based on factual findings which are binding on appeal unless they are clearly erroneous * * *

"To determine obviousness under 35 U.S.C. § 103: (1) the scope and content of the prior art are to be determined; (2) differences between the prior art and the claims at issue are to be ascertained; (3) the level of ordinary skill in the pertinent art is to be resolved; (4) the obviousness or nonobviousness of the subject matter is to be determined; and (5) such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented, since these may have relevancy as indicia of obviousness".

As a result of defendant Clairol discovering these earlier Japanese patents, mentioned *supra,* on December 2, 1968, defendant Clairol filed an amendment to the first patent application. Examination of this amendment indicates that it canceled much of the pending patent application, and set forth new claims pertaining to the VLMM, which were directed solely to variable light makeup mirrors utilizing filters as the means for varying the character of the light.

Before the Patent Office made a determination on this first patent application, as amended, which was discussed *supra,* defendant Clairol made public the VLMM, which had allegedly been invented by the plaintiff and Mr. Wilson. Ever since Mr. Wilson disclosed the VLMM concept, the defendant Clairol had taken steps to commercially develop prototypes of that product. It is undisputed that plaintiff had no personal involvement in this commercial development of the VLMM by defendant Clairol. Thus, on July 15, 1968, at an industry trade show in Chicago, the VLMM made its public debut under the name of the Clairol Mirror (note: from this point on, in this opinion, the VLMM will be referred to as the Clairol Mirror). A few weeks later, the Clairol Mirror was exhibited at a New York press show. Shortly thereafter, defendant Clairol commenced commercial marketing of the Clairol Mirror, and from the time of its introduction into the marketplace, the Clairol Mirror has proved to be a very successful product.

By letter, dated June 18, 1969, the Patent Office rejected defendant Clairol's first patent application, as amended, upon

the ground, *inter alia,* that the Clairol Mirror had been anticipated by the "prior art".

Thereafter, in October 1969, defendant Clairol tried again to patent the Clairol Mirror by filing a continuation-in-part application with the Patent Office. Defendant Clairol contends that the primary difference, between this new continuation-in-part application and the prior application, is found in the fact that the continuation-in-part application: (1) limits the claims to variable light makeup mirrors, which employ compensating filters; and, (2) expands the specifications to include a discussion of such filters. At the request of Clairol, Mr. Wilson, still an employee of defendant Clairol in 1969, executed, as the sole inventor, this continuation-in-part application, and again assigned his rights to defendant Clairol. Subsequently, on January 8, 1971, the Patent Office accepted a portion of this continuation-in-part application for issuance of a patent.

Furthermore, plaintiff alleges that, in the period after the Patent Office allowed a portion of this continuation-in-part application and prior to patent issuance, defendant Bristol-Myers brought in outside patent lawyers, to prepare a possible infringement suit, subsequent to patent issuance, against General Electric or other possible infringing manufacturers.

Moreover, plaintiff alleges that this firm, Fish & Neave, Esqs., discovered in the course of preparing this contemplated litigation that: plaintiff was allegedly a co-inventor of the Clairol Mirror; and, that the allowed claims of the continuation-in-part application were allegedly unpatentable because more than one year had elapsed between defendant Clairol's initial public disclosure of the Clairol Mirror on July 15, 1968 at the Chicago Trade Show, which was discussed *supra,* and defendant Clairol's filing in October 1969 of the continuation-in-part application.

The United States Circuit Court of Appeals for the Second Circuit unanimously held in *Robine v Apco, Inc.* (386 F2d 267, 269 [2d Cir 1967]), that: "35 U.S.C. § 102 (b) provides that a person shall not be entitled to a patent if 'the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.' This statute precludes the issuance of a valid patent if the inventor has commercially exploited his discovery for more than one year prior to the patent application".

In substance, plaintiff argues that defendant Clairol abandoned its continuation-in-part application, as a result of this more than one year delay in filing it.

Review of the record indicates that, after it had abandoned the continuation-in-part application, defendant Clairol now decided to file a third patent application concerning the Clairol Mirror, and that this third application was allegedly intended to incorporate, *inter alia,* product development of this mirror undertaken by defendant Clairol's employees between the years 1969 and 1971. Incidentally, plaintiff does not offer any persuasive evidence that leads us to conclude that she contributed in any way to the product development of the Clairol Mirror, mentioned *supra.*

Early in 1970, Mr. Wilson was promoted to vice-president of defendant Clairol Appliances, and Clairol contends that this promotion resulted in part from his work on the Clairol Mirror.

Therefore, in July 1971, defendant Clairol sought from plaintiff an assignment of her alleged rights in the subject mirror. While lawyers for defendant Clairol were discussing with plaintiff this proposed assignment, plaintiff alleges that in August 1971 the head of Clairol's patent and trademark operations advised her to "retain a good lawyer and find out what [her] rights and position were as coinventor *[sic]*". Thereafter, defendant Clairol continued discussions with the plaintiff with reference to assigning her rights; and, during that period plaintiff was represented by her own counsel. However, those discussions proved fruitless, and, in July 1972 plaintiff commenced the instant action against defendants. When plaintiff started this action, Mr. Wilson was no longer an employee of defendant Clairol, since his employment had been terminated in September 1971. Defendant Clairol contends that Mr. Wilson's termination, after approximately 11 years of employment with defendant Clairol, resulted from a drastic reduction in the staff of Clairol Appliances, due to "deteriorating profits and the need to cut costs".

Plaintiff, in her complaint, in substance, seeks damages from defendants for allegedly wrongfully using her invention, without compensating her. Five causes of action were contained in the original complaint. Causes of action one, two, three, four and five alleged, respectively: (1) unjust enrichment, and plaintiff sought an accounting from defendants, based upon breach of fiduciary duty; (2) fraud; (3) negligence in failing to prosecute a patent application in timely fashion; (4) waste; and, (5) breach of implied contract and fiduciary duty. Defendants served an answer, which included affirmative defenses.

Between 1972 and 1974, examinations before trial were held of the parties, nonparty Mr. Wilson and patent law experts.

In 1977, Special Term (Hyman Korn, J.) granted defendants' motion for summary judgment solely on the defense of the Statute of Limitations and dismissed all five causes of action. On appeal, this court unanimously modified Special Term's order, insofar as to deny defendants' motion as to the first, second, third and fifth causes of action, and only affirmed the granting of the motion to dismiss the fourth cause of action, which as mentioned *supra,* alleged waste *(Wilson v Bristol-Myers Co.* (61 AD2d 965 [1st Dept 1978]). In our memorandum, we stated, in pertinent part: "While we have doubts as to the sufficiency of the second and third causes and the likelihood of plaintiff's success on the others, we have not reached the merits because the motion did not clearly litigate such matters. On the face of the limited papers before the court and the restricted nature of the motion it appears that there may be facts sufficient to ground causes of action by plaintiff which are not time-barred to recover for unjust enrichment premised upon breach of a fiduciary duty or for breach of implied contract and breach of fiduciary duty founded upon her allegation that she was a coinventor * * * Therefore, we have disposed of the appeal without prejudice to a properly presented motion for summary judgment on the merits".

We find, after examining the record before us, that for all intents and purposes this action lay dormant between 1978 and 1984. Thereafter, in 1984, the plaintiff filed a note of issue. In response, defendants moved for summary judgment to dismiss the remaining four causes of action in the complaint.

Special Term (Kenneth Shorter, J.), in substance, granted defendants' motion only to the extent of dismissing cause of action number two, and otherwise denied it.

The gravamen of the second cause of action is that plaintiff, in substance, relied, to her detriment, on the allegedly false statements of Mr. Moss, who as mentioned *supra,* was counsel to defendant Bristol-Myers, made to Mr. Wilson that: "wives don't invent things"; and, Mr. Wilson was the sole inventor of the Clairol Mirror, since if plaintiff was considered a co-inventor it would complicate things for Clairol. Furthermore, plaintiff contends that, in reliance on this alleged false legal advice, she waited approximately five years to pursue her claim. As discussed *supra,* Mr. Moss allegedly gave this advice in 1967, and plaintiff did not commence her action until 1972.

It is hornbook law that: "In order to sustain an action for actual fraud the plaintiff must prove: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity [,] (8) to his injury (24 NY Jur, Fraud and Deceit, § 14; CJS, Fraud, § 3)" *(Brown v Lockwood,* 76 AD2d 721, 730 [1980]).

■ Special Term found that plaintiff did not provide sufficient evidence to make out a cause of action for fraud against the defendants. We agree. For example: (1) plaintiff testified, at her examination before trial, that, when Mr. Wilson communicated Mr. Moss' statement to her that "wives don't invent things", she did not "think it was a legal remark, I think it was just a man saying wives don't invent things. That I considered [it] just an aside"; (2) plaintiff does not offer any persuasive evidence that Mr. Moss owed her any duty as a lawyer, since Mr. Moss was not her lawyer but was rather a fellow employee along with her husband; (3) Mr. Moss' statement that Mr. Wilson was the sole inventor, we find was no more than a legal conclusion, and in view of the fact that plaintiff had knowledge of all the underlying relevant facts, she, a sophisticated and educated person, was at all times capable of seeking out independent legal advice from a counsel of her choice; and, (4) as to the plaintiff's contention that she relied on Mr. Moss' statements, we find that contention must fall, since she admits that Mr. Wilson told her that Mr. Moss told him to delete references to her in documents about the Clairol Mirror, and that information put her on notice that Mr. Moss was acting in the interest of the defendants, concerning defendants' rights, if any, against third parties. Based upon the record herein, we find that the plaintiff cannot recover for fraud, since she had full and complete knowledge of all of the essential and relevant facts *(200 East End Ave. Corp. v General Elec. Co.,* 5 AD2d 415, 417 [1st Dept 1958], *affd* 6 NY2d 731 [1959]; *see also, First Natl. State Bank v Irving Trust Co.,* 91 AD2d 543, 544 [1st Dept 1982], *affd* 59 NY2d 991 [1983]).

■ ■ However, our review of the record convinces us that Special Term erred in denying defendants' motion to dismiss the first, third and fifth causes of action in the complaint.

In substance, plaintiff in her first cause of action asserts a

claim against the defendants of unjust enrichment, based upon the alleged breach of their fiduciary duty toward her to account for their profits, derived from their commercial use of the Clairol Mirror.

Since plaintiff contends her first cause of action states a material triable issue of fact based upon the defendants' breach of their fiduciary duty to her, we do not make any finding as to whether plaintiff's concept of a variable light makeup mirror developed with Mr. Wilson is either novel or patentable, in view of the fact that such a finding would not be relevant to the question before us.

■ After searching the record, we hold that, in this 14-year-old case, which has included extensive discovery by the parties, the plaintiff has offered no evidence that raises a material triable issue of fact to establish a fiduciary relationship between plaintiff and defendants, concerning the Clairol Mirror.

The plaintiff in her respondent's memorandum concedes that Mr. Wilson disclosed the concept to the defendants, in accordance with his duties as an employee of defendants (*Byrne v Barrett,* 268 NY 199, 206 [1935]; *Computer Task Group v Professional Support,* 88 AD2d 768, 769 [1982]).

As quoted *supra,* when Mr. Wilson disclosed the concept in 1967 to the defendants, there was no discussion as to whether he or the plaintiff would receive any compensation, and, in particular, Mr. Wilson acknowledged, in answer to the following question, which was asked of him at an examination before trial:

"QUESTION: [By Attorney for defendants Clairol and Bristol-Myers] Did you say or do anything which you believe would have indicated to any of these people that either you or your wife [the plaintiff] expected to be compensated for disclosing that concept to Clairol or to be compensated if Clairol used that concept?

"ANSWER: No, I am sure I did not"

In the instant case, we find that there is no property interest of the plaintiff to be protected, since Mr. Wilson did not reveal the idea to defendants under circumstances which reasonably indicated either he or his wife expected compensation for its use by defendants (*Hamilton Natl. Bank v Belt,*

210 F2d 706, 709-710 [DC Cir 1953]). In fact, as stated *supra,* plaintiff's husband had a duty to present the idea to his employer. It is undisputed that plaintiff never revealed the idea to defendants, since, as discussed *supra,* her only direct conversations with the defendants took place in 1971, concerning the assignment of her rights, when defendants were preparing their third patent application.

Plaintiff attempts to get around the fact that she did not reveal the idea to the defendants in exchange for compensation by claiming to be the defendants' cotenant.

We find no evidence in this record that raises a material triable issue of fact that plaintiff was a cotenant of defendants in the Clairol Mirror.

No relevant legal authority has been submitted to us by the plaintiff that holds that a spouse of an employee, who discloses an idea to his employer, which the employer uses for its benefit, becomes a cotenant of the employer, once the employee assigns his rights to the idea to his employer. Plaintiff does not contend that she entered into an agreement with the defendants to promote the idea. Her only connection to the defendants in relationship to the idea was through Mr. Wilson, her husband, who was defendants' employee.

We note in passing, without finding that plaintiff was a legal cotenant of defendants in the Clairol Mirror, that under the Federal Patent Act: "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use or sell the patented invention without the consent of and without accounting to the other owners" (35 USC § 262). Thus, in view of the fact that plaintiff has no agreement with defendants, even if she had been a cotenant with them, pursuant to the plain meaning of the section of the patent law just cited, they would not have had a duty to account to her for their profits, if the Clairol Mirror had in fact been patented.

■ We reject plaintiff's contention that her third cause of action states a cause of action. This third cause of action, in substance, claims that defendants negligently prosecuted the patent application, which involved her idea. Regardless of whether the defendants were negligent in prosecuting that application, the law is clear, when it is applied to the facts herein, defendants were acting in their own self-interest, and not solely and gratuitously for plaintiff. The defendant owed plaintiff no duty to properly prosecute the patent application

*(see, e.g., Home Mut. Ins. Co. v Broadway Bank & Trust Co.,* 53 NY2d 568, 576 [1981]; *Matter of James v State of New York,* 90 AD2d 342, 344 [1982], *affd* 60 NY2d 737 [1983]).

Finally, we find that plaintiff's fifth cause of action fails to state a cause of action, since, in substance, plaintiff simply realleges the theories of fraud, breach of fiduciary duty, and tenant in common, which we found, *supra,* inapplicable to the instant case.

This court stated, in *Kramer v Harris* (9 AD2d 282, 283 [1st Dept 1959]), that: "Bald conclusory assertions * * * are not enough [to defeat a motion for summary judgment]".

■ In summary, we find that, when the plaintiff's contentions, as presented in her causes of action one, two, three and five, are evaluated in the context of the undisputed facts and the obvious realities of the events, there are no material and triable issues of fact raised; and, therefore, the defendants' motion for summary judgment as to these causes of action should be granted *(see, Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065, 1067-1068 [1979]).

Accordingly, the order of the Supreme Court, New York County (Kenneth Shorter, J.), entered April 3, 1985, which, *inter alia,* denied defendants' motion for summary judgment dismissing plaintiff's first, third and fifth causes of action, is unanimously modified, on the law and on the facts, to the extent of granting defendants' motion to dismiss the first, third and fifth causes of action, and otherwise affirmed, without costs.

Sullivan, J. P., Lynch, Milonas and Rosenberger, JJ., concur.

Order, Supreme Court, New York County, entered on April 3, 1985, unanimously modified, on the law and on the facts, to the extent of granting defendants' motion to dismiss the first, third and fifth causes of action, and otherwise affirmed, without costs and without disbursements.